The next case on our calendar is Honickman v. Brumbank. Good morning and may it please the court. This is Michael Reddin of OSIN LLC on behalf of the Plaintiffs' Appellants. I'd like to begin this morning by focusing on the District Court's misstatement of the general awareness standard set forth in Halberstam v. Welsh, which applies to JASTA claims. The District Court held that plaintiffs must allege Blom's awareness of a role in terrorist attacks, but the lower court's decision, which relies substantially on Kaplan v. LCB, which is currently before this court as Leachy v. LCB, is incorrect. Under JASTA, a defendant must be generally aware that is playing a role in violent or life-endangering activities. It doesn't necessarily have to be violent. From which acts of international terrorism are a foreseeable risk? The standard comes from Halberstam, where the defendant assisted, quote, overall illegal or tortious activity, which there was a criminal enterprise and stolen goods, from which, quote, violence and killing is a foreseeable risk. Under JASTA, then, terrorist activities or life-endangering activities, as the court in Linde used those phrases, means conduct relating to a terrorist enterprise, not terrorist attacks. Here, the lower court disagreed with Halberstam's foreseeability framework, holding that it is, quote, not enough for plaintiffs to plausibly allege that Blom was generally aware of its role in terrorist activities, from which terrorist attacks were a natural and foreseeable consequence. Kind of an interesting idea that the District has specifically incorporated into the JASTA framework, isn't it? Yes, I agree, Your Honor. And indeed, on the next page of its decision on footnote eight, the court mentions the passage from Halberstam I quoted a moment before and rejects it as incompatible with Linde. But Linde, of course, explicitly adopts Halberstam and does not require more from a pleading than allegations of knowingly funding a terrorist organization. Indeed, it held that whether, quote, providing routine financial services to associates of terrorist organizations is itself a violent, life-endangering act for the purposes of primary liability, much less playing a role in them for secondary liability, is a jury question. And that's Linde at 327. So the result is, the lower court found it dispositive that Blom had no specific knowledge that these nominal charities engaged in any violent activities themselves, to quote the lower court. But Blom more than plausibly knew that they were engaged in life-endangering activities and that they were Hamas fundraising institutions. Did they know that they were Hamas fundraising institutions? Did you allege that in your complaint? And did you have any evidence to support that? Yes, Your Honor. This is the district court's second error. The allegations we presented, which this court is lenient as to the state of mind and takes allegations in their totality rather than in isolation, shows that Blom did know that. Hamas operated openly in Lebanon and in the Palestinian refugee camps. Hamas created the three customers, as they're called. So for instance, Sanibel, which the FBI in 2001 said was a, quote, known front or supporter for Hamas, created by Hamas as its, DAWA is the term, headquarters in Lebanon, led by Hamas leadership. And that means Hamas leadership at the time, despite Blom's suggestion otherwise. That's in our complaint at 591. Is it your argument that if Blom didn't know, they were willfully ignorant? They made themselves willfully ignorant of these facts that you allege here? It would have had to have been. It would have to be a decision at that point to not know what was clear, not only from Sanibel's status as a Hamas institution, but where the money was coming into Hamas. Millions of dollars are coming into Hamas from two organizations that were already designated by Israel. And then of course, from HLF, designated by the United States in 2001. And all this money was being converted into cash. So millions of dollars are coming in from Hamas' fundraising network abroad, and being pulled out in untraceable cash. Let me ask, do the allegations support the notion that being aware of red flags is tantamount to having an intention to further terrorist activity? Doesn't Lindy suggest that we need to have something more, and Siegel says that less than an intention to further that activity is inadequate to support liability under 2333? No, Your Honor. Lindy nor Siegel require intent, and Halberstam as well does not require intent, nothing in JASTA. Halberstam only requires general awareness and some degree of foreseeability. General awareness that there's a role that by participating, they're somehow playing a role with regard to the terrorist organization in some particular way, and that it's foreseeable from that role, that indeed terrorist activity might arise. They don't have to have a specific purpose and or awareness of that they're assisting terrorist activity itself, do they, under Halberstam? No, they don't. There's no intent required, and it was not at issue there. As Your Honor said, the question is the awareness of the role in terrorist activities from which violence is foreseeable. As the Supreme Court found in Holder v. Humanitarian Law Project, support for terrorist organizations results in violence. The phrase was facilitates more terrorist attacks, and that would be cleared here to Blanc, moving millions of dollars into the area, which is then pulled out in cash. Cash, which they admit at page 32 of their brief, they don't have visibility on the use for that cash. They just see it leaving the account in that untraceable cash. We know from the Treasury designation, though, that Sanibel is using that cash to, quote, provide funding to in Leach. He had fairly specific allegations with regard to some of the customers and their specific activities as the Treasury of Hezbollah. So the customers themselves were identified, and the transactions, including the ever-increasing daily cash transaction limits, had some coordination, at least as far as your complaint was in that same law firm here, was concerned in identifying the fact that it had an appreciation that it was going beyond just being the banker for these folks. Isn't that the case? I mean, you had far more specific allegations in Leach than you have here, don't you? Yeah, there are more specific allegations in Leach. There are allegations that are here that are not in Leach. For instance, here, there is the Hamas fundraising network that was already designated abroad, where the money is coming in from. That particular fact is not in Leach. But here, as in there, Sanibel is designated as a fundraising organization for Hamas, as is Union of Good. They're playing the same roles here, and that certainly would have been enough for the bank to be generally aware of the role that it's in. The defense is essentially the same, which is that these entities call themselves charities or commercial operations. But of course, that can't be immunizing under the statute. Providing that support to an FTO is enough as a pleading matter, certainly to meet JASTA. I see I'm over my time here. Are you both aware of a case entitled Rouvain versus Lebanese Canadian Bank? Yes, Your Honor. You're aware of that? That was argued last November? Yes, also called Leachy, that Judge Wesley referred to a moment ago. Thank you. I'm sorry. Judge Carney, did you have a question? No, no. Okay. Thank you. You've reserved two minutes for rebuttal. I'll turn to the counsel for the bank. May it please the court. Linda Goldstein for Blombank. The district court's decision is faithful to this court's precedence in both Lindy and Siegel, and the arguments you have heard this morning are largely an invitation to rewrite those two opinions. I will address the three defects in plaintiff's argument. First, the incorrect legal standard for the general awareness prong of a JASTA claim. Second, the insufficient factual allegations supporting the substantial assistance prong in this case. And third, the contention that the allegations in the complaint are enough to allow the case to go to discovery. First, both Lind and Siegel confirm that the general awareness prong of a JASTA claim requires that the defendant be aware that by assisting principle, it is itself assuming a role in terrorist activities, specifically activities that are violent or life-threatening. Neither case held that it is enough to allege that a defendant was generally aware that it was assuming a role in financing a foreign terrorist organization from which it was foreseeable that terrorist activities would later result. Well, let me ask you a question. If a panel of this court were to find that there's an inconsistency between Halberstam and Lindy, which controls? There is no inconsistency between... I asked you a question. If this panel were to find that there was an inconsistency between the two, which controls? Well, plainly, Your Honor, JASTA says that Halberstam provides framework. And so the question is, what is the framework that Halberstam provides? And my position, Your Honor, is that Halberstam, and if you let me explain... But doesn't it trouble you that the district court found that Halberstam was wrong and Lindy was right? Number one, Your Honor, I don't believe that that is what the district court held. But if I could point out, the very first paragraph of Halberstam's legal analysis at page 476 of the D.C. Circuit's opinion explains that the case addresses two separate questions. First, whether Halberstam was subject to vicarious liability for her partner's burglaries. And if so, whether the scope of that liability included a murder committed by her partner during the course of one of those burglaries. The opinion's reference to foreseeability arises only in connection with the second question and not the first. In other words, the foreseeability of the murder played no role in the court's analysis of whether Hamilton was subject to vicarious liability for the burglary. That first question was answered purely with reference to Hamilton's knowledge of Welch's property crimes at night and her role in processing the proceeds of those crimes. By analogy, under JASTA, a defendant must be found vicariously liable for one act of international terrorism. In other words, a defendant must be found vicariously liable for one act of international terrorism. In other words, a defendant must be found vicariously liable for one act of international terrorism. Now, I'm not going to go into the details of this case, but I will point out that it's not just one case. It's both. And I might also point to the statute, Your Honor. The statute creates aiding and abetting liability for acts of international terrorism. By statutory definition, that requires violence or life-threatening activity. Halberstam, by contrast, was a survey of common law aiding and abetting and conspiracy liability. And the court was clear that the analysis was meant to cover a broad range of torts, not just torts resulting in physical injury. But the analysis specifically refers, in numerous points, to aiding and abetting liability for securities fraud claims, which obviously would not involve violence or life-threatening activity. So what the courts did in Lindy and again in Siegel was take that middle prong of Halberstam, which refers to illicit, sorry, illegal or tortious activity, and replaced it with the words of JASTA, which is terrorist activity. And the sine qua non of terrorist activity is violent or life-threatening acts. And that is why Lindy and Siegel both correctly applied the Halberstam framework, which is what the statute requires, to the particulars of a claim under JASTA for vicarious liability under the Anti-Terrorism Act. If I might move on to substantial assistance. Substantial assistance in this part case are particularly flimsy. The only allegations against BLOM are that it processed deposits into the accounts of Sanibel and Subel Al-Khair, and that it facilitated distribution of small cash payments to Palestinian refugee camps living in Lebanon, not in the West Bank or Israel, which is where all of the attacks are alleged to have occurred. That is what the complaint says. There can be no speculation that the cash somehow went somewhere else. The complaint says that the cash went to those refugees in the camps in Lebanon, and there is no allegation that either Sanibel or Subel Al-Khair were themselves involved in violent or life-threatening activity. There is no allegation that any of the people that got that money engaged in violent or life-threatening activity, and there is no allegation that any of the funds transmitted to Sanibel or Subel Al-Khair made their way to Hamas. Excuse me, was Sanibel designated prior to by Israel? No, Sanibel was designated by Israel. That was not public. The complaint does not I tried very hard to find it. My library staff couldn't find it anywhere other than on Plaintiff's Council's website. Israel enacted a law in 2005, four years after the last of the attacks in this case, which for the first time allowed those designations to be posted on a website that banks could consult. But before 2005, they were not generally available, so there's no basis to that they were there. You take umbrage with your opponent's indication earlier that he said there was a designation of Sanibel prior, as early as 2001? The U.S. government did not designate Sanibel until August 23. That's just incorrect, your honor. Okay, very good, thank you. Israeli designation was earlier, but that was not public. Was there evidence that some of the money from Blom Bank was used to pay survivors of suicide bombings? That's not the case, your honor. There's no allegation of that. There's no allegation that either Sanibel or Subalal-Khair, the only two customers alleged to have received funds in the complaint, ever made such payments. And so that is one of the reasons, your honor, that a discovery of Blom's knowledge is really irrelevant, because there isn't even an allegation that that's what Sanibel and Subalal-Khair did. So when Blom received a payment, a transfer to a Sanibel account that is expressly designated help for orphan children, and what Sanibel does is give money to orphan children, there's no reason for Blom to be at all suspicious of that. Wasn't there one incident where the Sanibel account received extensive regular transfers from the Holy Land Foundation until September 2001, and the first terrorist attack occurred on December 1, and the Holy Land Foundation was then designated an SDGT on December 3? You know, putting those facts together, isn't it reasonable to infer or that the bank was at least put on notice that that's what was going on in that account? Well, number one, your honor, the standard is not inquiry notice. The standard is actual knowledge. The statute says general awareness. Well, the statute requires knowingly providing substantial assistance, number one. Number two, your honor, the last transfer from HLF, as you indicated, was in September of 2001, and the designation took place in December of 2001, and the complaint does not allege, nor am I aware, that a bank has any obligation to retrospectively investigate, not a customer, because HLF was not a customer, your honor. HLF was a transfer or to a customer, and there's no allegation that that is standard banking procedure for a bank to go back to its book and look at all of the incoming transfers that were made to all of its customers to determine if one of those customers, one of those transferors was later designated. So that's not a red flag. The substantial allegations in this case, your honor, are substantially weaker than those in Siegel, where this court held that substantial assistance was lacking, where HSBC was alleged to have provided millions of dollars to its customer, Al-Rajhi Bank, but the complaint offered at least conclusory allegations that Al-Qaeda in Iraq had received those funds. Here, there isn't even that, because there is no allegation in the complaint that either Sanibal or Soobal al-Khair sent any funds onto Hamas, and the entire argument depends not even on alter ego allegations, because the word alter ego does not appear in the complaint, and the word alias does not appear in the complaint. I believe Judge Wesley has a question. No, that's all right. I don't want to interfere with counsel's argument. Go ahead. I'm sorry, your honor. My point is the complaint merely conflates the two, and if this court, if the district court were to make an alter ego finding, it would have to meet the legal standard based on facts alleged in the complaint, and that was not done here. The legal standard is quite clear. Your honor, Judge Wesley recognized it in the Kirshenbaum case. It has to be when one entity so dominates and controls another that they must be considered principal and agent, and this is shown by proving significant and repeated control over the alleged agent's day-to-day operations, and that was not shown here. That defect is critical, because without that alter ego, I'm sorry, Judge Fuller. Your time has expired. Can you just wind up? Yes. Two points, if I may, your honor, just to finish up on alter ego, that without that alter ego allegation, the only substantial assistance that Blom is alleged to have provided here is facilitating the distribution of funds by Sanibel and Sugal Al-Khair to refugees in camps in Lebanon, not in Israel or the West Bank, and there's no allegation that any of those funds were used to fund terrorists. If I can quickly address the discovery issue, your honor. They say that they need to get discovery from Blom to cure their defective allegations. Those defects can't be cured by discovery from Blom. The alter ego defects, information about the relationship between Sanibel or Sugal Al-Khair and Hamas can't be cured by discovery from Blom. Whether it was well known in Lebanon that Sanibel and Sugal Al-Khair were associated with Hamas can't be determined by discovery from Blom. Thank you. Thank you, counsel. Thank you, your honor. Mr. Radim, you have two minutes for rebuttal. Thank you, your honor. Just a few quick points. First, as to the money going to refugees, that's what Sanibel claims. FTOs claim charitable uses for their money. Blom didn't have visibility on that, and of course, it was the finding of Treasury that what Sanibel did was provide funding to Hamas. Second of all, the reference to HLF, the argument that a bank shouldn't have to check all of its customers' accounts doesn't hold up when it's in terms of the customers who are known Hamas institutions. When an organization was openly created by Hamas, that is an account that a bank would be expected to check and see the millions of dollars coming in from HLF, an organization that was designated for, in part, paying families of suicide bombers. Finally, as to the Halberstam standard, of course, it does not require knowledge in the violence. The line is, for Hamilton's aiding and abetting the murder, it was enough that she knew she was involved in some type of personal property crime at night, whether as a fenced burglar or armed robber made no difference, because violence and killing is a foreseeable risk in any of those enterprises. The standard under JASTA is a different. The phrase terrorist activities is not in JASTA. That was a phrase from Lindy that is referring to the overall tortious or illegal enterprise in Halberstam from which violence is a foreseeable result. I find that I'd add that the Segal case here is particularly an apposite, where the plaintiffs failed to allege that any transfers for an FTO passed through HSBC at all. HSBC held no account for an FTO or an FTO front or altering or what have you. That's my time. Thank you, Your Honors. Thank you both. Thank you both for lively argument and reserved decision. I inform you that Rouvain versus Lebanese Canadian Bank was argued in November, and we may very well wind up holding this case for the decision in that case. Thank you.